[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-14749

Non-Argument Calendar

_____

WM MOBILE BAY ENVIRONMENTAL CENTER, INC.,

Plaintiff-Appellee-Cross-Appellant,

*versus*

THE CITY OF MOBILE,

Defendant,

THE CITY OF MOBILE SOLID WASTE DISPOSAL
AUTHORITY,

Defendant-Appellant-Cross-Appellee.

_____

Appeals from the United States District Court
for the Southern District of Alabama
D.C. Docket No. 1:18-cv-00429-KD-MU

_____

Before WILSON, ROSENBAUM, and ANDERSON, Circuit Judges.

PER CURIAM:

This appeal is about a 1993 waste management contract (Operating Agreement) between Appellant the City of Mobile Solid Waste Disposal Authority (the Authority) and Appellee-Cross-Appellant WM Mobile Bay Environmental Center, Inc. (WM Mobile).[1]  WM Mobile initiated this suit after the Authority breached the Operating Agreement.  WM Mobile's cross-appeal involves a 1994 contract (the 1994 Agreement) between the Authority and Cross-Appellee the City of Mobile (the City) concerning the disposal of the City's waste.  The jury awarded damages to WM Mobile for two of its claims related to the Authority's breach of the Operating Agreement.  The district court entered summary judgment for the City as to WM Mobile's claim related to the City's alleged breach of the 1994 Agreement because it found that WM

---

[1] The Operating Agreement was between the Authority and WM Mobile's predecessor in interest, Transamerican Waste Industries, Inc.  But for simplicity, we refer to the Operating Agreement as being between the Authority and WM Mobile.

Mobile was not an intended third-party beneficiary of the 1994 Agreement.

On appeal, the Authority raises these issues: (1) whether the district court erred in determining that the parties had diversity of citizenship when the lawsuit was filed; (2) whether the district court erred in determining that the exclusivity provisions in the Operating Agreement are enforceable; (3) whether the evidence presented for lost profits was sufficient to permit the jury to award damages; and (4) whether the district court erred in determining that the reimbursement provisions in the Operating Agreement are enforceable. WM Mobile's issue on cross-appeal is whether the district court erred in determining that WM Mobile is not a third-party beneficiary of the 1994 Agreement between the Authority and the City. After careful review of the record and the briefs, we affirm on all issues.

## I. Introduction

Because of the extensive litigation in the case, the parties are fully familiar with the factual and procedural background of this case. Accordingly, we only discuss those facts and relevant parts of the procedural history that are necessary when resolving the various issues on appeal. We address the Authority's issues on appeal first and then turn to WM Mobile's cross-appeal.

## II. The Authority's Appeal

### A. WM Mobile's Principal Place of Business is in Mississippi and the Parties Have Complete Diversity of Citizenship

We review a district court's determination of subject matter jurisdiction de novo. *Sweet Pea Marine, Ltd. v. APJ Marine, Inc.*, 411 F.3d 1242, 1247 (11th Cir. 2005). "A district court's finding as to a corporation's principal place of business . . . for purposes of establishing diversity jurisdiction, however, is a question of fact and cannot be overturned unless it was clearly erroneous." *Id.*

Subject matter jurisdiction exists for diversity purposes when the amount in controversy exceeds $75,000 and the parties are citizens of different States. 28 U.S.C. § 1332 (a)(1). The statute has been held to require complete diversity of citizenship, meaning that "diversity jurisdiction does not exist unless *each* defendant is a citizen of a different State from *each* plaintiff." *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 373 (1978) (emphasis in original). "[D]iversity jurisdiction is determined at the time of filing the complaint." *PTA-FLA, Inc. v. ZTE USA, Inc.*, 844 F.3d 1299, 1306 (11th Cir. 2016).

A corporation is a citizen of the state where it is incorporated and the state where its principal place of business is located. 28 U.S.C. § 1332(c)(1). The Supreme Court found that a corporation's principal place of business refers "to the place where a corporation's officers direct, control, and coordinate the corporation's activities." *Hertz Corp. v. Friend*, 559 U.S. 77, 92–93 (2010). It is normally "the place where the corporation maintains its headquarters—provided that the headquarters is the actual center of direction, control, and coordination, *i.e.*, the 'nerve center,' and not

simply an office where the corporation holds its board meetings." *Id.* at 93.

The Authority and the City are both citizens of Alabama and WM Mobile is a citizen of Delaware because it is incorporated in that state. The parties dispute whether WM Mobile's principal place of business is in Alabama or in Mississippi. If it is the former, then the parties are not citizens of different states. If it is the latter, then the parties have complete diversity. On appeal, the Authority maintains that WM Mobile's principal place of business is at the Chastang Landfill, which is in Alabama. We sent this appeal back to the district court on limited remand to make a finding on WM Mobile's principal place of business. The district court found that WM Mobile's principal place of business in 2018 was in Mississippi, so the parties were diverse when WM Mobile filed its complaint.

We affirm the district court's finding that WM Mobile's principal place of business is in Mississippi. The district court based its decision on the testimony of two of WM Mobile's officers that all major decisions of the company in 2018 were directed, controlled, and coordinated from an office in Madison, Mississippi. We find that district court did not clearly err in crediting that testimony.

The Authority's arguments to the contrary on appeal are unavailing. The Authority contends that WM Mobile's principal place of business is in Alabama because that is where most of the day-to-day activities of the company were taking place. But this fact is not dispositive because a corporation's principal place of business is "where a corporation's officers direct, control, and

coordinate the corporation's activities." *Hertz*, 559 U.S. at 92–93. While the day-to-day activities may have occurred in Alabama, the evidence shows that WM Mobile was directed and controlled by its officers in Mississippi. Further, the Authority's argument that WM Mobile could not have its principal place of business in Mississippi because it did not have a license to do business in that state is misplaced. WM Mobile did not transact business in Mississippi. Instead, it made decisions in Mississippi about its business transactions in Alabama. The Authority's remaining arguments in rebuttal also lack merit and we need not address them here. We therefore hold that the district court did not clearly err in finding WM Mobile's principal place of business to be in Mississippi and the parties have complete diversity of citizenship.

## B. The Exclusivity Provisions of the Operating Agreement Are Enforceable

Next, we turn to whether the district court erred in determining that the exclusivity provisions of the Operating Agreement do not conflict with state law and are thus enforceable. The district court made this determination in the context of a motion for judgment as a matter of law. We review a motion for judgment as a matter of law de novo, applying the same standards as the district court. *Nebula Glass Int'l, Inc. v. Reichhold, Inc.*, 454 F.3d 1203, 1210 (11th Cir. 2006).

The exclusivity provisions of the Operating Agreement, Sections 1.32 and 5.2, require that the Authority dispose of all municipal solid waste at the Chastang Landfill, which is operated by WM

20-14749              Opinion of the Court                7

Mobile.  WM Mobile alleged that the Authority breached these provisions by diverting waste to a different landfill.  Under the Operating Agreement, the Authority pays WM Mobile $20 per ton of waste delivered to Chastang Landfill.  Accordingly, WM Mobile claimed lost profits for the waste that should have been delivered to Chastang Landfill but was instead diverted to a different landfill.

On appeal, the Authority argues that these exclusivity provisions stating that waste be delivered only to Chastang Landfill are unenforceable because it conflicts with the City's 1992 Solid Waste Management Plan (the 1992 Plan).  The 1992 Plan was adopted pursuant to Alabama's statute titled the Solid Waste and Recyclable Materials Management Act, Ala. Code. § 22-27-1 *et seq.* (the Solid Waste Act).  The Solid Waste Act requires that local governments in Alabama submit "a plan for the management of solid waste generated within its boundaries."  Ala. Stat. § 22-27-47.  The 1992 Plan stated that certain types of waste—yard waste, construction debris, and municipal street wastes—were currently being disposed of at a different landfill, the Bates Field Landfill.  Thus, according to the Authority, because the 1992 Plan called for these types of waste to be deposited at the Bates Field Landfill, and not the Chastang Landfill, the exclusivity provisions of the Operating Agreement that *all waste* be deposited at the Chastang Landfill conflict with the 1992 Plan.

In support, the Authority cites the Court of Civil Appeals of Alabama's decision in *Alabama Disposal Solutions-Landfill, LLC v. Town of Lowndesboro*, 837 So. 2d 292 (Ala. Civ. App. 2002).  In

*Lowndesboro*, a town adopted an ordinance that prohibited land-fills within city limits and its police jurisdiction. 837 So. 2d at 294. The town did not have its own waste management plan, so it fell within the surrounding county's plan. *Id.* at 294–95. The county's plan called for the placement of a landfill outside the city limits of the town, but within its police jurisdiction. *Id.* at 294. In determining that the town's ordinance was invalid, the court applied the rule that "[a]n ordinance may be 'inconsistent' with State law if it prohibits conduct permitted under State law." *Id.* at 301. Because the Solid Waste Act requires local governments to "follow a local solid-waste-management plan in deciding where to locate a landfill" and the county's plan permitted a landfill near the town, the town's ordinance prohibiting a landfill conflicted with state law. *Id.* at 302.

Here, the facts are much different. First, the Operating Agreement is not an "ordinance" but a contract between the Authority and WM Mobile. The 1992 Plan specifically provides that the City and the Authority "may choose to contract with private contractors to perform solid waste collection and/or disposal activities." Second, the Operating Agreement does not "prohibit" anything that the 1992 Plan "permits." *Lowndesboro*, 837 So. 2d at 302. While the 1992 Plan states that some waste was currently being deposited at the Bates Field Landfill, it does not suggest that the waste was to be deposited there forever. In fact, the 1992 Plan specified that because of construction near the Bates Field Landfill, "it is anticipated that the Bates Field Landfill will probably be relocated." Thus, the 1992 Plan contemplated that while certain waste

was currently being deposited at the Bates Field Landfill, it was likely that the Bates Field Landfill would fall out of use.

In sum, the exclusivity provisions of the Operating Agreement are not inconsistent with the 1992 Plan. The 1992 Plan expressly authorized the Authority to enter into private contracts for waste management and there is no requirement in the 1992 Plan that the City had to dispose of waste at the Bates Field Landfill. Accordingly, we affirm the district court's ruling on this issue.

## C. The Evidence Was Sufficient to Permit the Jury to Award Damages for Lost Profits

Now that we have determined that the exclusivity provisions are valid and enforceable, we turn to whether the evidence at trial was sufficient to permit the jury to award damages for the Authority's breach of those provisions. The jury returned a verdict of $2,000,000 in lost profit damages for WM Mobile. Following the district court's entering of the judgment, the Authority filed a renewed motion for judgment as a matter of law. The district court denied the motion, finding that the jury's verdict as to lost profits was supported by sufficient evidence.

We review the sufficiency of the evidence de novo, but with deference to the jury's verdict. *Crawford v. ITW Food Equip. Grp., LLC*, 977 F.3d 1331, 1342 (11th Cir. 2020). This deference means that "all evidence and inferences must be in the light most favorable to the prevailing party, and the Court must ask whether there was any legally sufficient basis for the verdict, remembering

that credibility determinations, evidentiary weighing and inference drawing are jury functions." *Id.* With this standard of review in mind, we address whether the evidence was sufficient to support the jury's verdict for lost profits.

The parties dispute the standard of proof for lost profits. The Authority argues that the plaintiff must prove lost profits with "reasonable certainty." WM Mobile maintains that it need only prove lost profits by "the best evidence available."[2] In denying the Authority's renewed motion for judgment as a matter of law, the district court agreed with WM Mobile. We agree with the district court and WM Mobile that the best evidence available standard of proof applies. What standard of proof applies turns on whether the lost profits are general damages or consequential damages.

The Alabama Supreme Court's decision in *Mannington Wood Floors, Inc. v. Port Epres Transport, Inc.*, 669 So. 2d 817 (Ala. 1995), is instructive. There, the court distinguished between general damages and consequential damages, both of which could refer to lost profits. 669 So. 2d at 822–23. For general damages, the court noted that "damages awarded for breach of contract should return the injured party to the position he would have been had the contract fully been performed." *Id.* at 822. There, the plaintiff claimed that the defendant breached a shipping contract because it

---

[2] It is not clear from the record what standard of proof the jury was asked to apply, but since neither party challenges the jury instructions on appeal, we need not address that issue.

diverted its product to another location, thus depriving the plaintiff of the profits it would have made had the plaintiff shipped that product. *Id.* at 820. The contract price was also determined by the weight of the product, like this one. *Id.* at 819. The court found that the plaintiff's lost profits were for general damages, not consequential ones, because it "was merely seeking to recover the amount it should have received for shipping wood by-products under the terms of the contract." *Id.* at 823. Similarly, here, the Operating Agreement provides that the Authority is to send all its waste to the Chastang Landfill and WM Mobile receives a fee of $20 per ton of waste delivered. Thus, since WM Mobile is simply claiming damages for the profits it would have received had the Authority performed its obligations under the Operating Agreement and sent all its waste to Chastang Landfill, we conclude that these are claims for general damages.

As the court in *Mannington* noted, a plaintiff can recover for general damages if "he has produced the best evidence available and it is sufficient to afford a reasonable basis for estimating his loss." *Id.* at 822. The heightened "reasonable certainty" standard applies to consequential damages, not general damages. *Id.* at 823. Accordingly, we consider whether WM Mobile proved lost profits with the best evidence available.

The Authority's main contention on appeal is that the Operating Agreement called for price to be determined based on weight. But the other landfill where the waste was diverted to did not weigh the amount of waste it received. Instead, it charged based

on the size of the truck bed carrying the waste. Thus, the waste sent to the other landfill was measured in volume, not weight. And, the Authority argues, the conversion factor used by WM Mobile in converting the volume of diverted waste to weight was unreliable.

We conclude that the evidence here was sufficient to permit the jury to award damages for lost profits. WM Mobile introduced the invoices charged to the City for the waste that should have been delivered to the Chastang Landfill. Testimony at trial showed that these invoices were the only records documenting the volume of waste diverted to the other landfill. Although these invoices used cubic yards, rather than tons, WM Mobile produced conversion factors from the Environmental Protection Agency (EPA) that could be used to convert the volume measurement to weight. While the Authority argues that these conversion factors are unreliable, it offers no evidence of better conversion factors that could have been used. Further, when questioned on whether he used the EPA conversion factors in his own work, the Authority's own expert responded that he "more than likely" did and that he "probably" did so on multiple occasions. Thus, the defendant's own expert recognized the utility of these conversion factors.

The jury need not achieve "mathematical precision" when computing damages. *Mannington*, 669 So. 2d at 822. For lost profits resulting from general or expectancy damages, the plaintiff need only prove them through the best evidence available. *Id.* Here, the invoices listing the volumes of diverted waste were the only

evidence available for the quantity of waste that the Authority sent to the other landfill.  And the conversion factor from the EPA provided a "reasonable basis for estimating [WM Mobile's] loss."  *Id.* Accordingly, we hold that the evidence was sufficient to permit the jury to award damages for lost profits.

### D. The Reimbursement Provisions of the Operating Agreement Are Enforceable

The Authority's last issue on appeal concerns the reimbursement provision of the Operating Agreement, Section 6.6. This provision of the Operating Agreement relates to one of WM Mobile's breach of contract claims for the Authority's failure to reimburse WM Mobile for certain capital expenditures.  In ruling on the parties' motions for summary judgment, the district court determined that Section 6.6 is valid and enforceable.  We review questions of contract interpretation de novo.  *Dear v. Q Club Hotel, LLC*, 933 F.3d 1286, 1293 (11th Cir. 2019).

The Authority argues that Section 6.6 is void for uncertainty because it is an agreement to agree in the future.  Under Alabama law, "courts will not enforce a contract which is vague, indefinite, or uncertain."  *Muscle Shoals Aviation, Inc. v. Muscle Shoals Airport Auth.*, 508 So. 2d 225, 228 (Ala. 1987).  "[T]o be enforceable, a contract to enter into a future contract must be definite and certain in all of its terms and conditions so that the court can know what the parties have agreed upon."  *Id.*

Section 6.6 of the Operating Agreement is titled "Price Adjustments" and contemplates unforeseen circumstances that might result in increased costs.  The purpose of the provision is to "provide a means of arriving at adjustments in Payments or compensation hereunder to Contractor to reflect the resulting cost impacts." Further, the Contractor, which at the time was WM Mobile's predecessor in interest, can request adjustments to compensation "to reflect the change in the cost of the Contractor doing business." Section 6.6 then lists situations that might warrant such negotiations between the Contractor and the Authority.  The Authority argues that because Section 6.6 only provides that the parties may enter into negotiations, it is an uncertain "contract to enter into a future contract." *Id.*

The Authority might be correct if that were all Section 6.6 said.  But the following language from Section 6.6 rebuts the Authority's argument:

> *Notwithstanding any provision in this Contract to the contrary*, the Authority shall reimburse Contractor for any increases in Contractor's costs due to laws, rules, regulations or ordinances that become effective or have different interpretations after the date this Contract is entered into and that have an adverse impact on Contractor hereunder.

As our emphasis of the above text shows, Section 6.6 mandates that the Authority "shall" reimburse the Contractor, despite other provisions of the Operating Agreement.  Thus, even if other provisions

of Section 6.6 merely suggest that the parties can enter into negotiations to discuss increases in cost, the above language mandates that the Authority reimburse the Contractor if the increase in cost is due to changes in laws or regulations. We thus hold that Section 6.6 is enforceable and not void for uncertainty.

### III. WM Mobile's Cross-Appeal

Lastly, we address WM Mobile's cross-appeal against the City. WM Mobile brought a breach of contract claim against the City under a third-party beneficiary theory for the 1994 Agreement between the City and the Authority. In the 1994 Agreement, the City conveyed its entire waste stream to the Authority. Further, the City designated the Chastang Landfill as the "sole deposit point of all non-hazardous and non-infectious municipal solid waste collected by the City." WM Mobile claims that the City breached the 1994 Agreement by diverting waste to a different landfill.

But WM Mobile was not a party to the 1994 Agreement. To prevail, it must establish that it was a third-party beneficiary to the 1994 Agreement. The district court granted summary judgment for the City for WM Mobile's claims against it because it found that WM Mobile was not a third-party beneficiary to the 1994 Agreement. We review a district court's grant of summary judgment de novo. *Cone Corp. v. Hillsborough Cnty*, 908 F.2d 908, 913 (11th Cir. 1990).

We have noted that in cases applying Alabama law, the "crucial inquiry" for third-party beneficiary status "involves a

determination of intent, and third parties may sue on the contract only if it may be said to have been intended for their direct, as opposed to incidental, benefit." *Beverly v. Macy*, 702 F.2d 931, 940 (11th Cir. 1983). We first look to the language of the contract when determining the parties' intent because "the intention of the parties is to be derived from the contract itself, where the language is plain and unambiguous." *H.R.H. Metals, Inc. v. Miller ex rel. Miller*, 833 So. 2d 18, 24 (Ala. 2002). If the contract is ambiguous, then we may also look to the circumstances to determine whether a third-party benefit was intended. *Id.*

WM Mobile argues that it is a third-party beneficiary under the 1994 Agreement because the City and the Authority agreed to send all the City's waste to the Chastang Landfill. So, as the argument goes, both parties to the 1994 Agreement intended a direct benefit to WM Mobile because they knew that WM Mobile had a contract with the Authority to operate the Chastang Landfill. WM Mobile relies on the Supreme Court of Alabama's decision in *Locke v. Ozark City Board of Education*, 910 So. 2d 1247 (Ala. 2005). There, a baseball umpire was assaulted by an unruly parent at a baseball game hosted by a local high school. 910 So. 2d at 1249. The school was a member of the Alabama High School Athletic Association (AHSAA). *Id.* at 1248. The AHSAA Directory stated that schools have a duty to provide "good game administration and supervision by providing . . . adequate police protection." *Id.* at 1249. The umpire sued the school board for breach of contract because there were no police at the game when he was assaulted. *Id.*

Although he was not a party to the ASHAA's contract, the court found that a genuine issue of fact existed as to whether he was an intended third-party beneficiary of that contract. *Id.* at 1253–54. The court noted that the purpose of having police protection was to "provide good game administration." *Id.* at 1253. The contract "anticipates the existence of a third party" because game administration "necessarily involves umpires." *Id.*

The 1994 Agreement here anticipates the existence of a third party, but it is not WM Mobile. Instead, the intended beneficiaries are the citizens of Mobile. This is indicated from the plain language of the 1994 Agreement that "the City has determined that it is *in the best interest of the citizens of the City* to contract with the Authority to insure [sic] that the City meets its long term needs for a landfill to dispose of its solid waste at a reasonable price." Further, the purpose of the 1994 Agreement was to fulfill "a matter of grave concern *to all citizens of the City of the Mobile*" which was "the disposal of solid waste." Thus, the provision of the 1994 Agreement designating Chastang Landfill as the sole deposit point for waste was not intended to directly benefit a private operator of the landfill, WM Mobile, but to directly benefit the City's citizens. It makes no difference who manages the Chastang Landfill, whether it is the Authority, WM Mobile, or another entity. All that was intended by the 1994 Agreement was for the City to ensure that it could "dispose of its solid waste at a reasonable price." Accordingly, we conclude that WM Mobile was not an intended third-

party beneficiary of the 1994 Agreement and affirm the district court's grant of summary judgment for the City.

## IV. Conclusion

In conclusion, we hold that: (1) the district court did not clearly err in finding WM Mobile's principal place of business to be in Mississippi and thus the parties had complete diversity of citizenship when WM Mobile initiated this lawsuit in 2018; (2) the exclusivity provisions of the Operating Agreement do not conflict with state law and are enforceable; (3) the evidence was sufficient to permit the jury to award damages for lost profits; (4) the reimbursement provisions of the Operating Agreement are not uncertain and are enforceable; and (5) WM Mobile was not an intended third-party beneficiary to the 1994 Agreement between the Authority and the City.

**AFFIRMED.**